## COMMISSIONER OF INTERNAL REVENUE v. TIMKEN et al.

## TIMKEN et al. v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 9518, 9519.

Circuit Court of Appeals, Sixth Circuit.

April 7, 1944.

Warren F. Wattles, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, and Helen R. Carloss, all of Washington, D. C., on the brief), for Commissioner of Internal Revenue.

John G. Ketterer, of Canton, Ohio, and Luther Day, of Cleveland, Ohio (David B.

Day, of Canton, Ohio, on the brief), for H. H. Timken's Estate.

Before HICKS, MARTIN, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

These consolidated cases involve the income tax liability of the estate of H. H. Timken, deceased, herein called the taxpayer, for the years 1935, 1936, and 1937. Case No. 9519 is brought here by petition of the taxpayer for review of a decision of the United States Board of Tax Appeals entered September 28, 1942, to the effect that there were deficiencies in the tax for the years 1935 and 1936 in the respective amounts of $83,425.74 and $17,395.83. Case No. 9518 is brought here by petition of the Commissioner for a review of a decision of the Board entered on the same date to the effect that there was an overpayment in the tax for the year 1937 in the sum of $1,262.07. The stipulated facts were adopted by the Board as its findings of fact.

*No. 9519.*

On July 1, 1914, the decedent was the owner of stock in the Timken Roller Bearing Company, herein called the Bearing Company. That Company owned the stock of the Timken-Detroit Axle Company, herein called the Axle Company, which it acquired before March 1, 1913. This stock did not represent profits of the Bearing Company accumulated after March 1, 1913. On or about July 1, 1914, the Bearing Company declared a dividend payable in stock of the Axle Company of which the decedent received 6,268 shares, having a par value of $100 per share.

In 1919 the Axle Company stock was split 10 to 1 and in 1922 that Company paid a stock dividend of 150% and thereby the decedent's holdings of Axle Company stock were increased to 156,700 shares. In 1935 the decedent sold 38,215 of these shares for $267,572.50.

The 6,268 shares of Axle Company stock received by the decedent on or about July 1, 1914, then had a fair market value of $283.46 per share, or a total market value of $1,776,727.28. This was also their fair market value on March 1, 1913. By dividing the per share value of $283.46 by the number of shares into which each dividend share was finally divided, each of the 38,215 shares sold by the decedent in 1935

is found to have a value on July 1, 1914 of $11.34, or a total of $433,358.10. When decedent received the dividend of 6,268 shares of Axle Company stock in 1914, he made an entry on his books crediting their par value to his Investment Account in Bearing Company stock and charged the same amount to a new account representing his investment in the Axle Company. He did not enter on his books any part of this stock dividend in his income account. Both before and after 1914, the Bearing Company kept complete books of account which showed the details of the stock dividend of the Axle Company and the distribution thereof to the stockholders of the Bearing Company. Examinations of these books were made by representatives of the Commissioner in the years 1916 and 1917. In 1935, the decedent, in his tax return, reported a loss of $49,735.68 on the sale of the 38,215 shares of Axle Company stock. The Commissioner disallowed the deduction taken for the loss and held that the entire proceeds of the sale, $267,572.50, constituted taxable income and that decedent was liable to income tax upon 30% thereof, as provided by Revenue Act of 1934, Ch. 277, Sec. 117(a), 26 U.S.C.A. Int.Rev.Acts, page 707. The taxpayer petitioned the Board for a redetermination of the deficiency. The Board sustained the Commissioner and we do not think that the taxpayer has successfully carried the burden of showing that his decision was wrong. Austin Co. v. Com'r, 6 Cir., 35 F.2d 910, 912.

In making this adjustment as provided in Sections 111 and 113 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, pages 691, 696, the Commissioner held that the basis upon which to compute gain upon the Axle Company stock sold by decedent was zero. He justifiably took this position because the decedent had failed to report in his income tax return for 1914 any gain realized by the difference between the cost to him of the Axle Company stock and its market value. See Helvering v. Gowran, 302 U.S. 238, 243, 58 S.Ct. 154, 82 L.Ed. 224; Crane v. Com'r, 1 Cir., 68 F.2d 640. For the same reason the Board upheld the findings of the Commissioner. In addition it said: "The record in this case is absolutely devoid of any proof that the decedent ever paid anything for his Axle Company shares." A search of the record verifies the truth of this statement. It is true, according to the stipulation, that when de-

cedent received the 6,268 shares of Axle Company stock in 1914, on his books he reduced his investment account in the Bearing Company stock by the market value of the Axle Company stock received and charged the same amount to his investment account in the Axle Company. But this of itself did not show that the Axle Company stock had cost him anything or negative the inference that it had not. Book entries are at most only evidential, they are not conclusive. It is stipulated that decedent's failure to include in his income return for 1914 any part of the value of the Axle Company's stock distributed to him was due to the advice of his counsel, that such stock dividends were not taxable. This of course was an error of law (Peabody v. Eisner, 247 U.S. 347, 38 S.Ct. 546, 62 L.Ed. 1152) which did not exonerate the decedent.

The decision of the Board in Case No. 9519 is affirmed.

*No. 9518.*

On January 16, 1931, H. H. Timken, the decedent, contracted with his brother, W. R. Timken, for the reciprocal loan of certain securities. The decedent loaned his brother Liberty Loan 3½% Bonds having a market value of five million dollars and received from his brother 125,000 shares of no par value common stock of the Bearing Company having an equal market value. We do not cumber the record with the minute details of this loan contract. We quote paragraph 2 thereof:

"2. * * * WRT [W. R. Timken] agrees that unless dividends at $3 per share per annum are paid on said stock [Roller Bearing Company stock] up to the time WRT may call for re-delivery thereof as hereinafter provided he will pay to HHT [decedent] an amount covering any such deficiency in dividend up to $3 per share per annum. * * * "

In September, 1931, the annual dividends upon the Bearing Company stock dropped below $3 per share, and W. R. Timken made good the difference until June, 1932, when he defaulted in making the payments. His default continued until June 28, 1935, when the total deficiency aggregated $668,-525. For reasons not necessary to state, decedent and W. R. Timken then entered into a new agreement which cancelled the old one. Paragraph 3 thereof is as follows:

"3. The Existing Agreement hereby is cancelled and annulled; provided, however, that the said cancellation shall not affect the obligation of WRT, which WRT hereby acknowledges, to pay to HHT upon demand the indebtedness of $668,525 referred to in the second recital hereto, which obligation shall hereafter be unsecured and continue in full force and effect. * * * "

Two days later, on July 1, 1935, the decedent executed and delivered to the Timken Foundation of Canton, a nonprofit organization operated for charitable purposes, all of his right, title and interest in and to his claim against W. R. Timken for the above mentioned amount of $668,525. Following this assignment W. R. Timken executed his demand note to the Foundation at the request of its Trustees for the amount of his obligation. This note remained unpaid. On December 31, 1936, the decedent wrote to W. R. Timken in part as follows:

" * * * It is my intention immediately after the first of the year before I leave for California to make a gift to you of 9,200 shares of Timken stock. At the present market price of $73.00 this will cover the note of $668,000, which you owe the Foundation. Of course, to whatever extent you sell these shares to repay the money you have borrowed from the bank, you will not have it available for payment on the Foundation note and it is my understanding that you will take whatever additional shares is [sic] necessary from your own holdings and deliver them to the Foundation to pay off the $668,000 note. By delivering Timken stock to the Foundation in payment of this note, you will be able to keep this quantity of stock off the market and will be given credit for the full market price by the Foundation. * * * "

Two days later, on January 2, 1937, the decedent gave to W. R. Timken 9,200 shares of Bearing Company stock approximately worth $669,300, and on June 22nd following, pursuant to the understanding between W. R. Timken and decedent, W. R. Timken transferred these gift shares to the Timken Foundation and received credit therefor upon his note.

One question here is, whether decedent was liable for income tax for 1935, upon the amount of $668,525, representing his brother's indebtedness to him which was transferred by deed of gift to the

Foundation. We think he was not. It is doubtless true that this indebtedness represented potential or anticipatory income but it does not follow that it was income for 1935. Throughout that year the decedent, who kept his books on a cash basis, had no more than W. R. Timken's obligation and the Foundation had no more than his unsecured promissory note. The Board found, upon what we regard as sufficient evidence, that W. R. Timken was unable to meet his obligations and we find no reason to disturb that finding. There is nothing to show that either the decedent or the Foundation could have obtained payment in 1935. See Avery v. Com'r, 292 U.S. 210, 215, 54 S.Ct. 674, 78 L.Ed. 1216; United States v. Christine Oil & Gas Co., D.C., 269 F. 458. It is clear enough that throughout the whole transaction H. H. Timken was acting in good faith. He was obeying a natural impulse, to assist a financially distressed brother. This is evidenced by a specific provision in the deed of gift "that William R. Timken shall be given every opportunity and the full cooperation of the Foundation to work out his financial affairs." The decision of the Board upon this issue is affirmed.

■■ Further, we do not think that the decedent was liable for income tax upon the proceeds of the note of W. R. Timken to the Foundation when it was paid on January 2, 1937. W. R. Timken's obligation to his brother became the absolute property of the Timken Foundation upon the execution and delivery of the deed of gift on July 1, 1935. The decedent retained no further interest in the debt, although he did pay it for his brother in 1937, as hereinabove indicated. Decedent's gift to the Foundation was absolute and unconditional and there was nothing in the deed therefor that indicated otherwise. The decedent was competent to make it and the Foundation was competent to receive it and it follows that the Foundation became the legal owner thereof. Marshall v. Com'r, 6 Cir., 57 F.2d 633, 634; Weil v. Com'r, 5 Cir., 82 F.2d 561, 563. Moreover, we have been warned by a court of high repute (Moran v. Com'r, 1 Cir., 67 F.2d 601) that the doctrine of "constructive receipt" is of doubtful value and it has been observed that the doctrine should be cautiously and sparingly applied. See Mertens Law of Federal Income Taxation, Vol. 2, § 10.02, p. 3. The decision of the Board upon this alternative issue is likewise affirmed.

■ On July 30, 1931, the decedent and his two sisters loaned to their brother, W. R. Timken, at his request, three million dollars in cash and securities and took his promissory note therefor due one year after date. The note was not paid at maturity but W. R. Timken paid interest on it until April 30, 1932, when he defaulted. The accrued and unpaid interest, as of January, 1935, aggregated $476,539.87 and the decedent's portion thereof was $158,846.62.

On January 24, 1935, the decedent and his sisters by deed of gift irrevocably conveyed their entire title and interest in the loan to the Foundation and endorsed and delivered to it the note and its collateral. There was at that time a balance of $2,730,678.60 due on the principal.

In December, 1936, W. R. Timken paid the Timken Foundation $397,000 on the accrued interest and on January 26, 1937, the Foundation accepted stock of the Bearing Company in full settlement of its claims against W. R. Timken.

The Commissioner's contention is that the decedent was liable for income taxes for 1935 upon his portion of the interest upon the tri-party note to that date, to wit, $158,846.62, and in the alternative, for that portion of such interest which was paid by W. R. Timken in 1936, and for the balance of the interest accruing to him up to January 26, 1937, when the note was paid. The Board held otherwise and we concur. There is no evidence that decedent and his sisters declined to accept payment of the interest due them up to January 24, 1935. To the contrary, there is a strong inference that W. R. Timken was then unable to pay the interest. He had failed to pay for nearly three years. It is certain that decedent had no "economic benefit" from the note or interest therein in 1935. Upon that date his brother still owed upon the principal $2,730,678.60 and was altogether indebted to various parties in the sum of $9,777,499.39. The proposition that the decedent should be held liable for income upon the interest paid by W. R. Timken in 1936 and 1937 must fail for reasons hereinabove indicated. The deed of gift of January 24, 1935, was similar to the deed of gift of July 1, 1935. It was absolute and unconditional and there is no basis for holding that any interest paid by W. R. Timken in 1936 and 1937 upon the tri-party note was constructively received by decedent.

The decision of the Board on this issue is also affirmed.

### The Imperial Investment Company Matter:

In accordance with the stipulation of facts, the Board found that the Imperial Investment Company, a corporation, was organized in 1930. So far as is material here, it had a capital of 800 shares having a par value of $100 per share. The decedent owned 300 shares of this stock. The Investment Company kept its books on a cash basis and made its income tax returns accordingly. On January 1, 1936, it had no accumulated earnings or profits. Its earnings and profits for 1936 amounted to $247,011.94. In that year it made cash distributions to its stockholders in the sum of $248,000. It owned 12,000 shares of the stock of Twin Coach Company, which it acquired immediately after its incorporation. This Coach Company stock and certain other securities represented the capital of the Investment Company. Its cost to the Investment Company as entered on its books was $30,857.14 and on July 6, 1936, it had a fair market value of $154,500. On July 6, 1936, the Board of Directors of the Investment Company authorized a distribution of these 12,000 shares and on that date the fair market value of the stock distributed to the decedent was $57,937.50. On that date the cash distribution above referred to exceeded the accumulated earnings and profits and the Company then, of course, had no undistributed earnings or profits. Upon its incorporation the Investment Company received property, as capital, worth substantially more than the par value of its stock, and such excess was credited to paid-in surplus. The Investment Company was not in process of liquidation in 1936 and no change was made in its capital during that year. Its stock was not impaired in that year since its surplus was in excess of the par value thereof. The distribution to decedent of the Coach Company shares was taken at their then fair market value and applied by him to reduce his investment in the stock of the Investment Company. The Commissioner contends that the amount of $46,366.07, the difference between the value of the stock when the Investment Company acquired it and when it was distributed to decedent, was taxable. The respondent contends that it was not taxable because it represented a return to the decedent of his capital investment in the shares of the Investment Company. It was clearly not the intention of the Investment Company to distribute the 12,000 shares of the stock of the Coach Company as income or dividends to its stockholders in the sense defined by Sec. 115(a) of the Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 868, because it had already, on the day before, distributed to its stockholders $200,000 which represented dividends or income in excess of its earnings for that year. This distribution of its shares was a distribution of its capital because it at that time had nothing else out of which it could make distribution and we think the case must be ruled by Sec. 115(d) headed "Other distributions from capital" which provides that "the amount of such distribution should be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property." The decedent did, upon the receipt of the shares distributed to him, apply them at their then market value to reduce his stock investment in the Investment Company.

The Commissioner contends, that regardless of what the Investment Company intended to do, the fact is, that in making its distribution of the Coach Company stock, it distributed to decedent stock work $57,937.50, which had cost it only $11,571.43, and that the difference was income taxable to decedent; but the difficulty with the proposition is, that a mere advance in the value of the property is not income. It is nothing more than an unrealized increase in value. See Mertens. Law of Federal Income Taxation, Vol. 1, p. 169, § 5.05 and cases cited. The transaction represented no gain to the decedent, because, in accordance with a resolution of the board of the Investment Company, as well as the provision of Sec. 115(d), the taxpayer applied the stock distributed to him to the reduction of his investment account in the Investment Company. Upon this issue the decision of the Board is, likewise affirmed.