**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**George M. GROSS and Anna Gross, Respondents (and ten other consolidated petitions for review).**

**Nos. 317–327, Dockets 23869–23879.**

United States Court of Appeals Second Circuit.

Argued April 11, 1956.

Decided Aug. 29, 1956.

Hilbert J. Zarky, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Acting Chief, Appellate Section, and Frank E. A. Sander, Atty., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Harry J. Rudick, New York City (Mason G. Kassel, New York City, on the brief), for respondents.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

These are appeals from a decision of the Tax Court, 23 T.C. 756, involving alleged income tax deficiencies in excess of $3,000,000 for the years 1948 and 1949. These eleven cases, all involving distributions to various members of the Gross and Morton families, who were common stockholders of certain building corporations, were consolidated both in the Tax Court and for review here. The facts as stipulated by the parties and found by the Tax Court may be summarized as follows:

Alfred Gross, George Gross, and Lawrence Morton were experienced builders who collaborated in the construction of several housing projects. The first such project, located in Baltimore County, Maryland, and completed in 1944, was operated through four Maryland corporations—First Mars Homes, Inc., Second Mars Homes, Inc., Third Mars Homes, Inc., and Fourth Mars Homes, Inc.—which were controlled by these three men and their families. The project was financed through mortgages insured by the Federal Housing Administration (FHA).

The next project developed by the taxpayers was Glen Oaks Village, located in Queens County, New York, and constructed in two parts. Part I, consisting of 576 apartments covering about 25 acres, was erected by Glen Oaks Village, Inc., a New York corporation organized on April 8, 1947, and controlled by the Gross and Morton families. Glen Oaks Village, Inc. rented the land from the Permanent Land Corporation, also controlled by the Gross and Morton families, for an initial term of 50 years at a rental equal to 4 percent of the land value as appraised by the FHA. Temporary financing was obtained under a building loan agreement with the Bank of Manhattan Company; and the resulting mortgage, which finally totaled $4,652,000, was fully insured by the FHA. Upon completion of the project in 1948, the mortgage was taken over by the Prudential Insurance Company of America, which paid a premium of $3\frac{1}{2}$ per cent of the principal amount of the mortgage to Glen Oaks Village, Inc.

Simultaneously with the development of Part I of Glen Oaks Village, another corporation, Seton Realty Corporation, was organized to develop a shopping center. In 1948 and 1949 this corporation and the Permanent Land Corporation, which owned the land for Part I of Glen Oaks Village, borrowed substantial sums from insurance companies, secured by mortgages on their realty. These corporations had no mortgages insured by the FHA.

Part II of Glen Oaks Village, consisting of 2,352 apartments covering approximately 100 acres, was constructed in a manner substantially similar to Part I. In order to facilitate financing and because the FHA was allowed to insure

mortgages only up to $5,000,000 while the cost of Part II was expected to approach $20,000,000, Part II was constructed through ten separate corporations. Again two Gross-Morton corporations which owned the land conveyed separate parcels of realty to Permanent Land Corporations #2, #3, #4, #6, #7, #9, #11, #12, #13, and #15. Each of these corporations gave a lease on its realty to a correspondingly numbered Glen Oaks Village Corporation, and each Glen Oaks Village Corporation secured temporary financing from the Bank of Manhattan Company and permanent financing from the Prudential Insurance Company or (in the case of Corporations #12, #13, and #15) from the New York State Employees' Retirement System. Each mortgage was fully insured by the FHA.

On October 19, 1949 each of the Permanent Land Corporations executed bonds secured by first mortgages on its land in favor of the Teachers Insurance and Annuity Association of America and received mortgage proceeds. The Permanent Land Corporations had no mortgages insured by the FHA.

Glen Oaks Shopping Center, Inc., is a New York corporation organized in 1948 to develop a shopping center for Part II of Glen Oaks Village. It had no transactions with the FHA.

George Gross, the president, Alfred Gross, the secretary, and Lawrence Morton, the treasurer, of each of the Glen Oaks Village and Permanent Land Corporations, directed the planning, financing, and building of Glen Oaks Village. None of the three devoted his entire time to the project. None of them received salaries from any of these corporations during 1948 or 1949. In 1950 each received compensation of $25,000 from Glen Oaks Shopping Center, Inc.

In 1948 and 1949 the four Mars Home Corporations, the eleven Glen Oaks Village and eleven Permanent Land Corpo-

rations, and the Seton Realty Corporation, made pro-rata cash distributions in excess of $6,000,000 to their common stockholders, the eleven members of the Gross and Morton families here concerned.[1] Prior to making these distributions each of the corporations wrote up on its books the value of its real estate by an amount equal to or in excess of its distribution. The amounts of the write-ups were credited to a "Surplus Arising from Realty Appreciation."

To the very substantial extent that these distributions were not out of normal earnings and profits of the corporations they came from the following sources:

In the case of the four Mars Home Corporations, from cash resulting from the build-up of depreciation reserves. In the case of the eleven Permanent Land Corporations, from mortgage moneys, i. e., moneys borrowed by the corporations secured by mortgages on their land. In the case of the eleven Glen Oaks Village Corporations and Seton Realty Corporation, from (1) current gross rentals from tenants, (2) premiums received on bonds issued by the corporations to Prudential Insurance Company and New York State Employees' Retirement System, and (3) the excess of moneys borrowed for construction purposes, secured by FHA-insured mortgages, over the cost of construction.

The reasons for the surplus of mortgage moneys received by each of the Glen Oaks Village operating companies over the cost of construction and development were set forth in the following letter of October 27, 1949, from Glen Oaks Village, Inc., to the Comptroller of the Federal Housing Administration:

"With reference to the distribution made on December 15, 1948, we wish to submit the following information.

"Although the cash outlay made by the company is less than the esti-

1. Glen Oaks Shopping Center, Inc. also made a distribution of undivided interests in land in 1949; but the Commissioner conceded in the Tax Court that the taxpayers properly accounted for this distribution.

mate made by you of the normal current cost to reproduce the property, this difference is explained by the fact that no payment was made for some expenses usually incurred in a building operation. These expenses included, among other things, the following.

"1. Builder's and architect's fees normally paid to a general contractor.

"2. Sub-contractors' fees and retailers overhead and profit where materials were procured directly by us through large scale cash purchases.

"3. Free use of heavy building equipment.

"4. Transfer, at original cost, of inventories of material, top soil, etc., on hand.

"If these items had been paid for in cash by the company at prevailing prices at the time of delivery, and if the amount so paid had been added to the cash outlay by the company, the total amount paid would probably have exceeded your estimate of replacement cost.

"By following this procedure we left the excess funds in the company during construction and thereby remained in a far better financial position than if we had withdrawn the funds. Maintaining this liquid position at all times during the operation, particularly when prices of material and labor were rising daily, was our best guarantee of successful completion of the project.

"This procedure resulted in cash on hand in the corporation on completion of the project. We made capital distribution of the surplus."

It was stipulated and the Tax Court found that the surplus of mortgage moneys over the costs of construction was made possible for the reasons stated in this letter.

We are of course aware that the propriety of the distribution of these "windfall profits" has been seriously questioned. See Senate Hearings before Committee on Banking and Currency, 83rd Cong., 2nd Sess., FHA Investigation (1954). But as the Tax Court pointed out, no question of the legality or propriety of these transactions is raised in these proceedings. We are concerned only with the tax consequences of the distributions.

No contention has been made that the cash distributions received by the petitioners are tax free. Moreover, to the extent that the distributing corporations had earnings or profits of the current year or prior years, it is agreed that the distributions are taxable as ordinary income. The question is whether the distributions in excess of these amounts are taxable as ordinary income, as the Commissioner contends, or whether they are taxable under § 115(d) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115(d) as capital gains, to the extent that they exceed the basis of petitioners' stock.

The Commissioner conceded before the Tax Court and on this appeal that the earnings or profits of the corporations were not increased by reflecting on the books the appreciation in value of the realty. He also conceded that the borrowing of money and giving of mortgages to secure the loans did not constitute a realization of income, taxable or non-taxable, by the corporations.

The Tax Court held that to the extent that the distributions exceeded the current and accumulated earnings and profits of the corporations they were taxable only under § 115(d), and that they should therefore be applied first against the basis of the stock and the excess taxed as long-term capital gain.

The applicable statutory provisions leave little doubt that the Tax Court reached the proper result. Section 22(e) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(e) provides that "Distributions by corporations shall be taxable to the shareholders as provided in section 115." Section 115(a) defines dividends for tax purposes in such a way as to exclude distributions not out of ac-

cumulated "earnings or profits" or current "earnings or profits". Section 115 (d), on which the taxpayers rely, provides (with exceptions not relevant here) that any distribution which is not a dividend shall be applied against the basis of the shareholder's stock and the excess shall be taxed as capital gain. This language appears to be precisely applicable to the case at bar.

The Commissioner, however, contends that there is something about the distributions in this case which requires us to look outside the provisions of § 115 and bring into play § 22(a) which provides for the inclusion in taxable income of "gains or profits and income derived from any source whatever." It is argued that we are faced here with an anticipatory distribution of future profits and that it is anomalous to tax such distributions as capital gains when a distribution made after the realization of these future profits would undoubtedly be taxed as ordinary income. It is then contended that § 115(d) was meant to apply only to distributions which impair capital, and that since the distributions here neither impaired capital nor came out of earnings and profits, they cannot be dealt with under § 115. Thus the Commissioner claims that § 22(a) governs.

The Commissioner's argument that the distribution of these mortgage windfalls is an "anticipation of future profits" obscures the fact that the basic problem here is merely a somewhat novel manifestation of the much mooted question whether unrealized appreciation in value can be the source of a distribution taxable as ordinary income. It makes little difference whether the cash which was distributed came from "mortgage windfalls," or mortgage proceeds, or from some other source. The real source of the distributions was the appreciation in the value of the property. If the appreciation had not taken place and been recognized on the books, and the corporations had distributed mortgage proceeds or mortgage "windfalls" there could not be a clearer case of capital impairment. The obtaining of $100,000 in cash by incurring a concomitant liability of $100,000, secured by a mortgage, certainly creates no surplus. And if the corporation immediately distributes $50,000 to its shareholders without having any pre-existing surplus, its capital is surely impaired. When the corporation's liabilities are deducted from its assets, its net worth is an amount less than its paid-in capital. Under these circumstances state law would prohibit the payment of a dividend. New York Stock Corporation Law, McK.Consol.Laws, c. 59, § 58. The only thing which made a distribution possible here under New York law was the creation of a surplus by writing up the corporations' assets to reflect appreciation in the value of their real estate. Randall v. Bailey, 1942, 288 N.Y. 280, 43 N.E.2d 43.

Thus the question here is the familiar one whether a distribution made out of unrealized appreciation in the value of the corporations' assets is taxable as ordinary income. This question is one which has customarily been resolved within the framework of § 115. Thus the crucial question has been whether an unrealized appreciation in value increases a corporation's "earnings and profits." See C. I. R. v. Hirshon Trust, 2 Cir., 1954, 213 F.2d 523, 526–27, certiorari denied 348 U.S. 861, 75 S.Ct. 85, 99 L.Ed. 679; C. I. R. v. Godley's Estate, 3 Cir., 1954, 213 F.2d 529, 530–33, certiorari denied 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679; C. I. R. v. Timken, 6 Cir., 1944, 141 F.2d 625, 630; Andrews, "Out of Its Earnings and Profits": Some Reflections on the Taxation of Dividends, 69 Harv.L.Rev. 1403, 1430–32 (1956); 1 Mertens, Law of Federal Income Taxation, §§ 9.49, 9.50; Paul, Ascertainment of "Earnings or Profits" for the Purpose of Determining Taxability of Corporate Distributions, 51 Harv.L.Rev. 40, 51–64 (1937). But if a corporate distribution of unrealized appreciation were taxable as ordinary income under § 22(a), then it would be unnecessary to inquire whether such unrealized appreciation increases earnings

and profits. Nevertheless the Commissioner now urges that this problem must henceforth be dealt with outside § 115. We see no reason at this late date to adopt so drastic a change in approach to the problem, especially since the treatment suggested by the Commissioner finds no support in, and is indeed inconsistent with, the language of the statute. Section 115(d) does not say that only capital impairment distributions are taxable as capital gains; it says that all distributions other than dividends are taxable as capital gains. And dividends are clearly defined as distributions out of earnings and profits. It is true that the heading of § 115(d) is "Other distributions from capital", but this heading is not a part of the statute and cannot alter its provisions. See Act of Feb. 10, 1939, § 6, 53 Stat. 1a, 76th Cong., 1st Sess., 1939, 26 U.S.C.A. (I.R.C.1939) preceding section 1; Nor does the Commissioner's position find any support in C. I. R. v. Hirshon Trust, supra, or C. I. R. v. Godley's Estate, supra. Both of these cases involved distributions of property by corporations which had earnings and profits sufficient to cover the property's basis. In both cases it was held that in these circumstances the distributions were "out of earnings or profits" and that the entire value of the property was therefore taxable as dividends. These cases are obviously no authority for the proposition that a distribution not out of earnings or profits can be taxed as ordinary income.

Moreover, to hold that these distributions are taxable as ordinary income would create an anomalous situation where the same corporate earnings might twice provide a source of taxable dividends. When the presently unrealized appreciation in value is ultimately realized, either by sale of the property or by the receipt of rentals over a period of years, it will increase earnings and profits and provide a source of taxable dividends. See U. S. Treas. Reg. § 1.-312–6(b) (1955); Reg. 118, § 39.115(a)–2(b); Reg. 111, § 29.115–3; I.R.C. 1939, § 115(e); C. I. R. v. Wheeler, 1945, 324 U.S. 542, 545, 65 S.Ct. 799, 89 L.Ed. 1166, rehearing denied 325 U.S. 892, 65 S.Ct. 1182, 89 L.Ed. 2004; 1 Mertens, Law of Federal Income Taxation §§ 9.-34, 9.43. But if we tax the distribution of unrealized appreciation and also use the realization of the appreciation to increase earnings and profits at a later date, we tax the same earnings twice as ordinary income to the stockholders.

For all these reasons we are unable to accept the Commissioner's argument that a corporate distribution not out of earnings and profits may be used as ordinary income. It may well be that the earnings and profits requirement is subject to criticism and that a more satisfactory method of taxing corporate distributions could be devised. See e. g. Andrews, op. cit., supra at pp. 1433–39; cf. Cohen, Surrey, Tarleau and Warren, A Technical Revision of the Federal Income Tax Treatment of Corporate Distributions to Shareholders, 52 Col.L.Rev. 1, 6–7 (1952). But we must work within the framework which Congress has provided.[2]

The Commissioner conceded from the beginning, and still concedes, that there

2. Congress has reacted to the situation presented by this case by enacting § 312 (j) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 312(j), applicable to distributions made after June 22, 1954. This section provides that where a corporation, at the time of making a distribution to its shareholders, has outstanding a loan insured by any agency of the United States and the amount of the loan exceeds the adjusted basis of the property constituting the security for the loan, the corporation's earnings and profits shall be increased by the amount of such excess. If this section had been enacted prior to the distributions made in this case it would make taxable as ordinary dividends the amounts distributed by those of the corporations which had FHA insured loans. It would not affect the distributions by the corporations which did not have such loans. The Senate Finance Committee expressly stated that the enactment of this section was not to give rise to any inference as to the law applicable to previously pending cases. Sen.Rep. No. 1622, 83rd Cong., 2d Sess., p. 251.

has been no increase in earnings and profits either by reason of the write-up on the corporate books to reflect unrealized appreciation or by reason of the borrowing of money secured in part by that appreciation. There are not here such unusual circumstances as would justify our reversing the Tax Court on the basis of an argument which was not made before it. Helvering v. Cement Investors, Inc., 1942, 316 U.S. 527, 535, 62 S.Ct. 1125, 86 L.Ed. 1649; Helvering v. Wood, 1940, 309 U.S. 344, 348–349, 60 S.Ct. 551, 84 L.Ed. 796; Kamen Soap Products Co. v. C. I. R., 2 Cir., 1956, 230 F.2d 565, 567. But even if the Commissioner had made these arguments there is no reason to believe that he would have prevailed. It seems well settled that unrealized appreciation does not increase "earnings and profits". See C. I. R. v. Hirshon Trust, supra, 213 F.2d at page 527; C. I. R. v. Godley's Estate, supra, 213 F.2d at page 532; C. I. R. v. Timken, supra, 141 F.2d at page 630; Mertens, Law of Federal Income Taxation § 9.49; Andrews, op. cit. supra at 1405; Albrecht, "Dividends" and "Earnings or Profits," 7 Tax.L.Rev. 157, 182 (1952); Paul, op. cit. supra at 51–64. And we have held that the mortgaging of property for an amount in excess of its basis does not result in a realization of income even when the mortgagor is not personally liable to repay the loan. Woodsam Associates, Inc., v. C. I. R., 2 Cir., 1952, 198 F.2d 357.

■ The Commissioner makes a subsidiary argument that some portion of the amounts received by George Gross, Alfred Gross, and Lawrence Morton must be deemed to represent salaries and fees for the services which they rendered, and that this portion is taxable as ordinary income. We think the Tax Court properly disposed of this contention. The distributions were made pro-rata to all the stockholders. The officers of a corporation are not compelled to take salaries for the services they render. They may donate their services to the corporation if they choose to do so.

There is nothing in the stipulated facts which indicates that these distributions were anything other than the corporate distributions to shareholders which they purported to be. The fact that the distributions were made pro-rata to all stockholders, even though most of them rendered no services, negates the idea that they represented compensation for services rendered. There is nothing in the record which indicates that any of these shareholders were not bona-fide shareholders. Under these circumstances there is no basis for reversing the Tax Court's finding that no part of the distributions represented compensation for personal services.

The judgment of the Tax Court is affirmed.

CLARK, Chief Judge (dissenting).

In a noteworthy article under the arresting title, Erosion of the Tax Base and Rate Structure, 11 Tax L.Rev. 203 (1956), the late Randolph E. Paul, "our most eminent tax commentator," [1] points out persuasively that we have a far less progressive income tax system than is popularly supposed by either the advocates or the opponents thereof, and that the progression remaining after considerable erosion over the course of time works a number of gross discriminations, notably against wage earners. After pointing out how the high progressive rates become largely theoretical in the upper brackets because of various exclusions, particularly adjustments for realized capital gains, he goes on to discuss leakages in the tax structure and stresses the preferential treatment accorded capital gains—preferences which "probably are the major reason for the disparity between theoretical and actual rates of income taxation in the high income brackets." His suggestions of the real dangers for the income tax in "these variations in the rate structure and erosions of the potential tax base," leading

---

1. Rudick, Randolph E. Paul, 11 Tax L.Rev. 201 (1956), quoting Judge Jerome Frank.

to substantially "a system of taxation by confession," are arresting discussions of social policy. The same theme is stressed by another distinguished commentator, Professor Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 1009 (1956): "A wide area of the problem of defining capital gain thus became a shell game, with the taxpayer in control because he could determine under which legal shell to place the asset." And he continues, at page 1015: " * * * the difficulties inherent in the present approach to the definition of capital gain are formidable almost beyond belief," and "there is no escape from plunging deeper and deeper into this technical jungle of the definition of capital gain."

No better illustration of the trend deplored by these outstanding experts can be found than the present case. The more the tax statute becomes complicated, the more, I suppose, must it be a question of form over substance; and perhaps we must follow the literal language of the statute at all costs for fear of worse troubles if we try to look for equities. But this means that the statute becomes increasingly a matter of particular cases, and that the distinguished members of the tax bar need only bring their clients' situations within some purely formal statutory terms to secure exemption or relief from burdensome taxation. The problem becomes increasingly one of semantics only, soluble by astute and sophisticated counsel. Perhaps this cannot be helped; but I do feel that we should preserve equities where we can, and not make the game too easy for our brethren of the tax bar lest they lose their cunning for lack of challenge.

My brothers' opinion herein, able though it is from this logistic standpoint, seems to me to illustrate the point in its continued reiteration that the gains here involved are necessarily only those from the appreciation in value of capital assets. True it is that here we have real estate mortgages, the proceeds of which are to be used by the mortgagors to build improved structures on the real estate.

Were we to stop right there, we would indeed have a place for literal application of statutory terms granting preferential tax treatment. So my brothers insist: "The real source of the distributions was the appreciation in the value of the property." But I am bound to feel that "real" here can be used only in a Pickwickian sense. For the real source of the funds here distributed was bank funds insured by the FHA, i. e., supported by the bottomless Treasury of the United States. But since one does not draw even federal funds without some legal basis, we must look to the occasion for the advances, which was, as is conceded, the building of these improved dwellings at prices less than the government estimate. If, therefore, we go beneath the surface, we find that, realistically considered, this was anything but the case of a realty owner investing in capital to improve the premises in the hope of later realized gain. Here the risk was taken over by the Government, and the money was in hand at once. The situation, in other words, was that of an experienced workman realizing proper and adequate payment for the fruit of his toils. This is clearly brought out in the letter of October 27, 1949, quoted in the opinion explaining the grounds of the receipts as based in the superior expertise of the three builders here chiefly involved. That they worked through corporations, rather than as individuals, does not change the nature of the gains as being this type of monetary award for services performed, rather than the profits from investments which have turned out well.

Hence to point up the distinction it would seem desirable to view the builders here—the Messrs. Gross, Mr. Morton, and their corporations—not as the owners, since their capital was not put at risk, but as only skilled artisans of the land improvements so far as concerns the portions of their activities here involved. Of course, as to other portions not shielded by governmental protection, they were ordinary risk bearers and entitled to the capital gains preference when their investment turned out well. But

here they received at once and paid out the fruits of their skills as superior workmen and builders erecting structures where others would bear the loss if any ensued. This is made the clearer by the litigation now developing to secure the return of these windfalls, as noted in the opinion. See Sarner v. Mason, 3 Cir., 228 F.2d 176, certiorari denied 351 U.S. 924, 76 S.Ct. 781. Respondents are going on the basis that these gains are all theirs, and so must we—until and unless other legal determination is made.

So viewed realistically, must we still say that the corporate distributions of the moneys thus obtained (1) clearly and necessarily are not payments of dividends out of corporate earnings or profits and (2) of necessity are capital gains under the Internal Revenue Code of 1939, § 115(a) and (d)? I submit that this is putting the cart before the horse by looking for the preferential exception before we see if we have the normal situation when taxpayers receive money in hand. For there can be no question that the distributions made here fall within the broad definition of gross income provided by the Internal Revenue Code of 1939, § 22(a). Recently the Supreme Court has emphasized the breadth of this provision: "We have repeatedly held that in defining 'gross income' as broadly as it did in § 22(a) Congress intended to 'tax all gains except those specifically exempted.' See, e. g., C. I. R. v. Glenshaw Glass Co., 348 U.S. 426, 429–430, 75 S.Ct. 473, 476, 99 L.Ed. 483." C. I. R. v. Lo Bue, 351 U.S. 243, 246, 76 S.Ct. 800, 803, finding a taxable gain upon the exercise of an incentive stock option granted a corporate employee. See also C. I. R. v. Glenshaw Glass Co., supra, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483, holding amounts received as punitive damages for fraud and antitrust violations includable in gross receipts, and General American Investors Co. v. C. I. R., 348 U.S. 434, 75 S.Ct. 478, 99 L.Ed. 504, holding "insider profits" recovered under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), likewise includable in gross receipts. Compare also Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, and United States v. Bruswitz, 2 Cir., 219 F.2d 59, certiorari denied Bruswitz v. United States, 349 U.S. 913, 75 S.Ct. 600, 99 L.Ed. 1247, as to the proceeds of extortion; and see discussion in Rapp, Some Recent Developments in the Concept of Taxable Income, 11 Tax L.Rev. 329, 331, 358–371 (1956).

On the other hand, the preferential capital gains provisions of the Internal Revenue Code which are exceptions from its normal tax requirements must be "narrowly applied * * * to effectuate the basic congressional purpose." Corn Products Refining Co. v. C. I. R., 350 U.S. 46, 52, 76 S.Ct. 20, 24. These exceptional provisions were intended "to relieve the taxpayer from these excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. This situation hardly seems one which Congress had in mind when it provided for capital gains treatment of certain transactions. Here the corporations were able to borrow funds in excess of their actual needs. These funds they promptly distributed to their stockholders when they saw that the construction costs would be less than as estimated in the then clear expectation that they would be able to pay back the loans out of their subsequent earnings and profits. In no way was the capital investment of the stockholders affected; the corporations merely passed on to the stockholders these excess mortgage "windfalls" soon to be covered by corporate earnings.

According to taxpayers' argument we have to determine only whether the corporate distributions are made from earnings and profits; if they are not, then they become automatically entitled to special capital gains treatment. And since the corporate funds so distributed do not appear to fit the tailored description of earnings or profits, the conclusion that

the distributions are capital assets easily follows. But this conclusion is subject to some of the questions or infirmities attendant upon all pat solutions of difficult problems. A mandate that everything which is not white shall be considered black may be all that is necessary to force things which are speckled or grayish to be taken as black. But there is sure to remain some doubt whether Congress actually so intended. Possibly in view of the wide sweep of income under § 22(a) the legislators over the years may have thought they were starting from the other viewpoint, namely, that what was not ebony was substantially white; at least the constant attempts to plug gaps discovered by astute tax lawyers may suggest some question as to the facile solution. Especially must this be so when it is noted that the result depends solely upon an unstated, but assumed, meaning to one of the more occult concepts of the Code, namely, a corporation's "earnings or profits".

There is much store of learning on this subject, but all to the demonstration that the meaning is elusive. As one author has acutely observed: "Although the concept of 'earnings or profits' is the very basis of the whole structure of taxing corporate dividends, no one really knows precisely what they are. The Code provides a punctilious description of 'dividends' as distributions out of 'earnings or profits' and then leaves 'earnings or profits' intensely undefined. This leaves the job of divining its meaning primarily to the Commissioner." Albrecht, "Dividends" and "Earnings or Profits," 7 Tax L.Rev. 157, 181 (1952).[2] He continues: "As usual in such circumstances, the starting point is legislative intent, but an examination of legislative history merely confirms the suspicion that Congress itself had no clear idea of what it had in mind." This perhaps explains why the various essays made by the parties into the history have been singularly unproductive. This is essentially a new problem where supposedly analogous precedents shed little real illumination and the shifts in position of the Bureau of Internal Revenue serve only to highlight the difficulties. The author arrestingly concludes, page 183: "Fundamentally then, 'earnings or profits' is an economic concept," and proceeds to an attempted reconcilement of "taxable net income" and "earnings or profits," with a showing of situations where the latter may exceed the former.

I do not find anything, therefore, to prevent giving natural effect to the economic basis of the gains here as analyzed above. True, the respondents and the opinion make much of what they consider the petitioner's concession that these gains are not corporate "earnings or profits," but are perhaps a new and intermediate class of corporate assets. Concessions by revenue officials are of doubtful validity at best; to me there always seems a tendency to press them beyond anything intended. Here petitioner, I think, is only accepting obvious law as to realty appreciation to point to distinctions—as indeed do I. In any event I cannot see the ordinary corporate executive viewing these assets as capital, so that he would not dare pay them out for fear of impairing capital. So the concept of capital as here unimpaired is of substantial significance. Indeed, the approach indicated seems the natural one, since there appears nothing in the statute (and indeed in the precedents) to bar an economic approach to the problem. Thus there is perhaps real significance (as we have heretofore found) in the fact that § 115(d) is captioned "Other distributions from *capital*." [Emphasis added.] As its caption indicates, § 115 (d) "is rather designed to subject to capital gains taxation those distributions which have left the capital of the corporation impaired." Judge, now Mr. Justice, Harlan, in C. I. R. v. Hirshon Trust, 2 Cir., 213 F.2d 523, 528, certiorari denied 348 U.S. 861, 75 S.Ct. 85, 99 L.Ed. 679.

2. For another valuable article showing the fluidity of the term, see Emmanuel, Earnings and Profits: An Accounting Concept? 4 Tax L.Rev. 494 (1949).

Here surely there has been no impairment of capital. In fact the distributing corporations specifically wrote up their realty prior to making the distributions and then paid the dividends out of this "Surplus Arising from Realty Appreciation." It is difficult, therefore, to maintain that the distributions were made out of capital unless we accept a novel definition of "capital" which includes everything that is not earnings or profits. It is quite reasonable that, as under the scheme of § 115(d), a return of contributed capital should be applied against the basis of the stock for which it was contributed. But such a provision has no reasonable application to mortgage windfalls distributed in anticipation of future profits; and an unstrained reading of the statute requires no different conclusion. There is no indication that Congress did or could have anticipated this novel use of the corporation as conduit for excess mortgage loans. Nor could it have intended to permit wholesale circumvention of the ordinary application of the taxing principles through the simple device of a borrowing against future earnings and prompt distribution of the borrowed funds.

Hence I would conclude that taxpayers have not succeeded in bringing these windfall distributions under the special capital gains treatment of § 115(d); and they remain taxable as ordinary income under the general provisions of § 22(a). In the case of the 4 Mars Home Corporations, the distributions were not out of borrowed funds, but out of depreciation reserves. Again, though a different accounting device was used, this distribution similarly failed to impair capital and was made in anticipation of future earnings and profits. It is indistinguishable from the accompanying distribution out of borrowed funds, and the same result must follow. The decision, in my view, should be reversed for the increased tax computation thus indicated.