JOHN T. WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 47775.   Promulgated January 15, 1935.

*Stanley Suydam, Esq.*, for the petitioner.
*P. A. Bayer, Esq.*, for the respondent.

### OPINION.

McMAHON: This is a proceeding for the redetermination of a deficiency in income taxes determined by the respondent for the year 1926 in the amount of $1,008.21. The issue presented in this proceeding is whether the respondent erred in including in the petitioner's taxable income dividends paid to petitioner by the Dry Fork Colliery Co. during the year 1926.

The petitioner is an individual, with principal office at Bluefield, West Virginia. He is a civil engineer.

The Dry Fork Colliery Co., hereinafter referred to as the company, was organized in 1907 under the laws of the State of West Virginia. Its capitalization was $25,000, consisting of 250 shares of stock. The petitioner had, at all times from 1907 through 1926, owned 26⅖ percent of the stock of the company, for which he paid the company $100 in cash per share. He was its secretary and treasurer and one of its directors, and has been familiar with the fiscal affairs of the company ever since its organization.

On July 1, 1907, certain individuals entered into an agreement leasing to the petitioner and other individuals a tract of coal land comprising about 130 acres situated in McDowell County, West Virginia. The lease provided for the payment of royalties of 10 cents per ton of coal mined and used for any other purpose than the manufacture of coke, and of 15 cents per ton of coke manufactured. It also provided for a minimum rental of $2,000 annually whether the amount of coal mined and coke manufactured produced that amount of rental or not. The lease was for a term of 30 years. On June 19, 1908, the lessees assigned the lease to the company for $1 and " other good and valuable considerations." The lease has been in the physical possession of the company ever since. From 1908 through 1926 the company removed coal from the property covered by the lease and paid royalties to the lessors.

In 1908, when the company started to extract coal from the land covered by the lease, the vein of coal was believed to be about 4¼ feet thick. However, as the mining continued it developed that the vein had an average thickness of about 5¾ feet. The company also removed coal from other land owned by it in fee which was contiguous to the land covered by this lease. All this land was operated as one property. About seven ninths of the mineable coal available to the company was leased, while the remainder was owned in fee. Royalty was paid on seven ninths of all the coal mined.

. In 1920 rock faults were encountered in both the upper and lower coal seams, which indicated that it would be impossible to continue to mine the coal for the term of the lease. Attempts were made in 1920 and 1921 to cut through the rock faults but these were unsuccessful and a substantial area of coal was left unmined. Of the total of 130 acres covered by the lease, about 90 acres of the lower seam were mined and about 15 acres of the upper seam were mined. The mining operations on the property covered by the lease ceased about the last of November 1928. In 1922 the company purchased in fee the land covered by the lease and thereafter continued to operate it. The books of the company do not show any leaseholds owned in 1922.

There was never any reserve set up for depletion of the coal property of the company, as revealed by the books. No figure was ever set up on the books as representing the value of the lease, and the books carry no depletion on account of the leasehold. The books of the company reveal that the only depletion ever taken by the company was taken upon land owned in fee which had cost $8,600.

The " net earnings " and net loss of the company as shown by the books after a subsequent adjustment made by a revenue agent to reflect additional depreciation, for the year 1913, after March 1, and for subsequent years up to and including 1926, together with other income, the dividends paid during that period and other charges as shown by the books, are as follows:

| Year ended Dec. 31— | Other charges | | Dividends | Net earnings |
| | Item | Amount | | |
| 1913 | | | $71,875.00 | 1 $52,919.00 |
| 1914 | Sundry charges | $2,370.60 | 61,250.00 | 68,226.70 |
| 1915 | | | 65,000.00 | 56,164.05 |
| 1916 | | | 54,999.99 | 58,184.15 |
| 1917 | Income tax, 1917 | 39,774.71 | 52,500.00 | 84,892.68 |
| 1918 | | | 1,875.00 | 12,185.82 |
| 1919 | Income tax, 1917 | 1,469.76 | | 806.98 |
| Do | Income tax, 1918 | 1,618.38 | | |
| 1920 | | | 20,500.00 | 57,179.93 |
| 1921 | | | | 2 19,307.01 |
| 1922 | Income tax, 1922 | 3,666.44 | 17,501.00 | 29,270.77 |
| 1923 | Income tax, 1923 | 7,802.22 | 56,375.00 | 71,585.53 |
| 1924 | Income tax, 1924 | 2,292.44 | 32,500.00 | 20,339.49 |
| Do | | | | 3 1,785.02 |
| 1925 | Income tax, 1925 | 4,260.80 | 35,000.00 | 32,698.44 |
| Do | | | | 3 1,158.11 |
| 1926 | Income tax, 1926 | 2,794.09 | 33,750.00 | 22,696.96 |

1 Five-sixths of year.     2 Net loss.     3 Interest, U. S. A.

The net earnings or losses by months for the year 1926, as shown by the books after a subsequent adjustment made by a revenue agent, and the dividends paid by months during the year 1926 by the company, as shown by the books, are as follows:

| Month | Net earnings or losses | Dividends paid | Month | Net earnings or losses | Dividends paid |
|---|---|---|---|---|---|
| January | $1,329.88 | $3,750.00 | August | $2,391.48 | $2,500.00 |
| February | 798.68 | 3,750.00 | September | 6,768.14 | 2,500.00 |
| March | 1,067.94 | 3,750.00 | October | 7,454.12 | 1,666.66 |
| April | ¹ 729.24 | 2,500.00 | November | 9,038.36 | 3,950.01 |
| May | ¹ 254.35 | 2,500.00 | December | ¹ 3,856.12 | 1,883.33 |
| June | ¹ 1,177.73 | 2,500.00 | | | |
| July | ¹ 134.20 | 2,500.00 | Total | 22,696.96 | 33,750.00 |

¹ Denotes loss.

The figure $22,696.96 in the above tabulations representing net earnings of the company for the year 1926 is not the income for that year as shown by the books, but is the income for such year as shown by the revenue agent's report. That figure was obtained after reducing the income of the company for that year as shown by its books by an amount of approximately $10,000 additional depletion and depreciation. The tax liability of the company for that year was adjusted accordingly.

The income tax return of the company for the year 1913 shows net income of $46,394.46. The return of the company for the year 1915 shows net income of $53,754.50.

The books of the company showed surplus at March 1, 1913, in the amount of $97,314.25.

During 1926 the company paid to its stockholders dividends in the amount of $33,750. Of this amount, $9,000.01 was paid to the petitioner. The respondent held that this dividend paid to the petitioner was a dividend paid from earnings subsequent to March 1, 1913, and that it was not a liquidating dividend. He therefore increased the reported taxable income of the petitioner for 1926 accordingly.

The sole question presented is whether the aggregate of $9,000.01 paid by the company to the petitioner in 1926 is taxable as dividends. In his petition the petitioner alleged that this amount was not taxable for the reason that it was a liquidating dividend. However, there is no evidence in the record which indicates that it was a liquidating dividend, and we so hold. Furthermore, at the hearing and on brief the petitioner apparently abandoned this contention and, on the other hand, took the position that the amount is not taxable for the reason that it constituted a distribution of earnings or surplus accumulated by the company prior to March 1, 1913. We will, therefore, further consider only the question of whether this was a dividend from earn-

ings or profits accumulated, or increase in value of property accrued, before March 1, 1913, or was a distribution out of earnings or profits accumulated after February 28, 1913, within the meaning of section 201 of the Revenue Act of 1926. There are set forth in the margin applicable provisions of sections 201 and 213 of the Revenue Act of 1926.[1]

The petitioner contends that the company was entitled to take depletion deductions, over the years from March 1, 1913, to 1926, inclusive, upon the leasehold heretofore described, upon the basis of the value of the leasehold at March 1, 1913, which, petitioner contends, was $280,666.45. The evidence shows that the company did not take any depletion throughout this period, and it is the petitioner's contention that we should now allow this depletion for present purposes and that such allowance would absorb all the net earnings and profits of the company accumulated after February 28, 1913, as shown by the books, so that there would be, in 1926, no net earnings available for taxable dividends. The petitioner refers to depletion of the leasehold upon the basis of its value at March 1, 1913. A lessee is entitled to deductions for depletion of its leasehold interest in coal covered by a lease, based upon the value of such interest at March 1, 1913, if the proof establishes all the factors essential to the allowance of such deductions. *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364; and *Palmer* v. *Bender*, 287 U. S. 551. The petitioner introduced certain evidence, based upon earnings of the company, intended to prove the value at March 1, 1913, of the leasehold, as well as evidence intended to prove the value at such time of all the coal in all of the coal properties of the company, exclusive of equipment. However, whether this evidence is sufficient to prove the values of the leasehold and of the coal or whether either of these values, even if correct, would constitute the basis for the calculation of depletion, we find it unnecessary to determine, since petitioner has not shown other factors necessary to establish the amount of the depletion deductions to which the company was

---

[1] SEC. 213. For the purpose of this title, except as otherwise provided in section 223—

(a) The term " gross income " includes gains, profits, and income derived from  *  *  * dividends  *  *  *. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period.

SEC. 201. (a) The term " dividend " when used in this title (except in paragraph (9) of subdivision (a) of section 234 and paragraph (4) of subdivision (a) of section 245) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, .or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 204.

entitled from March 1, 1913, through 1926. The deduction in any year for depletion of mineral deposits held under lease, as well as for those owned in fee, is computed by ascertaining the original quantity of the mineral contained in the mine and then applying to the basis the proportion which the amount mined bears to the amount of coal originally ascertained to be contained in the mine. In *United States* v. *Ludey*, 274 U. S. 295, the Supreme Court stated in part:

The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed. The fact that the reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can rarely be measured. It must be approximated. And because the quantity originally in the reserve is not actually known the percentage of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a rough estimate. But Congress concluded, in the light of experience, that it was better to act upon a rough estimate than to ignore the fact of depletion.

In *Lynch* v. *Alworth-Stephens Co.*, *supra*, the Supreme Court stated in part:

The general provision in section 12 (a), Second, is that the deduction from gross income shall include a reasonable allowance for the " exhaustion * * * of property." There is nothing to suggest that the word " property " is used in any restricted sense. In the case of mines, a specific kind of property, the exhaustion is described as depletion, and is limited to an amount not exceeding the market value in the mine of the product mined and sold during the year. The interest of respondent under its leases in the mines being property, its right to deduct a reasonable allowance for exhaustion of such property, if there be any, during the taxable year results from the plain terms of the statute, such deduction, since the property is an interest in mines, to be limited to the amount of the exhaustion of respondent's interest caused by the depletion of the mines during the taxable year. * * *

It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other; and the extent of it, with the consequent deduction to be made, in each case is to be arrived at in the same way, namely, by determining the aggregate amount of the depletion of the mines in which the several interests inhere, based upon the market value of the product and allocating that amount in proportion to the interest of each severally considered.

See also *Bankers-Pocahontas Coal Co.*, 18 B. T. A. 901; affirmed upon this point in *Bankers-Pocahontas Coal Co.* v. *Commissioner*, 55 Fed. (2d) 626; affirmed in *Bankers-Pocahontas Coal Co.* v. *Burnet*, 287 U. S. 308; *Ajax Coal Co.*, 7 B. T. A. 305; *McAlester-Edwards Coal Co.*, 10 B. T. A. 1368; and *North American Coal Corporation*, 28 B. T. A. 807, 847.

In the instant proceeding there is no evidence to show the estimated quantity of coal covered by the lease at March 1, 1913, or at the end of 1926, or the amount mined each year. In this situation it would be impossible for us to determine the amount of depletion sustained by the company for each year from March 1, 1913, through 1926, or for any or all of these years. It appears that in 1922 the company purchased the land covered by the lease. Thereafter, the company's depletion deductions would be entirely different from the deductions to which it would have been entitled prior to that time. The basis would then and thereafter include the cost of the interest which the company purchased, which is not shown. Furthermore, under the Revenue Act of 1913 the deduction for exhaustion or depletion of mines was limited to 5 percent of the gross value at the mine of the output in any particular year (sec. II G (b), Revenue Act of 1913), and under the Revenue Acts of 1916 and 1917 the depletion allowance in any year was limited to the market value, in the mines, of the coal mined and sold in the particular year. (Sec. 12 (a) Second, Revenue Act of 1916 and sec. 203, Revenue Act of 1917.) Here we not only do not know how much coal was contained in the mine on March 1, 1913, and the amount extracted in the years from March 1, 1913, through 1926, but we do not have any evidence of the value in the mine of the coal mined during the years coming under the Revenue Acts of 1913, 1916, and 1917. In all these respects the record is so incomplete that it is impossible for us to determine the amount of the depletion which the company sustained from March 1, 1913, through 1926.

The petitioner's theory, gathered from his brief, that the company was entitled to deduct the March 1, 1913, value of the lease pro rata each year over the term of the lease, without reference to the actual physical depletion sustained, is clearly erroneous. Whether the deductions to which the company was entitled during the period March 1, 1913, through 1926 be called exhaustion of the lease or depletion of the company's interest in the coal under the lease, the deduction would still be determined by the rate of extraction of the coal. *Lynch* v. *Alworth-Stephens Co.*, *supra*. See also *Royal Collieries Co.*, 1 B. T. A. 369.

Even though the petitioner had shown the amount of the depletion to which the company was entitled, there would still remain for consideration the question, which in view of the conclusions

arrived at herein it is unnecessary to decide, as to whether there is acceptable evidence in the record as to the earnings or dividends of the company subsequent to March 1, 1913. It is elementary that the respondent's holding that the dividends in question are taxable to the petitioner is prima facie correct, and the burden is upon the petitioner to overcome the presumption in favor of the respondent's holding. Evidence submitted by the petitioner touching upon the amount of earnings or profits of the company accumulated after February 28, 1913, consists primarily of proof of what the books of the company show, as adjusted in some respects by a revenue agent, without any proof that the book entries are correct. Cf. *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179; *Chatham & Phenix National Bank*, 1 B. T. A. 460; *Mandel Brothers*, 4 B. T. A. 341; *Ledbetter Manufacturing Co.*, 12 B. T. A. 145; *Pacific Coast Pipe Co.*, 11 B. T. A. 1329; *Sterling & Welch Co.*, 15 B. T. A. 925; and *Georgia, Florida & Alabama Railroad Co.*, 31 B. T. A. 1.

Were we to assume that the evidence submitted by the petitioner as to net earnings from March 1, 1913, through 1926, as well as to the net losses for 1921, dividends paid, etc., as shown by the books, and as adjusted in some respects by the revenue agent, is correct, there would still be sufficient earnings or profits accumulated after February 28, 1913, available in 1926, to cover the dividends in question herein, in view of our holding that the petitioner has not shown that the net earnings should be reduced during this period for depletion. On the basis of the book figures as adjusted submitted in evidence, the distributions made in 1913, 1915, and 1917 were in excess of the earnings or profits accumulated after February 28, 1913. However, these distributions, to the extent that they exceeded the earnings or profits accumulated subsequent to February 28, 1913, were paid out of March 1, 1913, surplus, but can not be applied to reduce earnings accumulated subsequent to the time of such distributions in computing the earnings or profits thereafter available for taxable dividends. *F. W. Henninger*, 21 B. T. A. 1235, and *Stanley M. Bolster, Executor*, 23 B. T. A. 347. See also *Helvering* v. *Canfield*, 291 U. S. 163. A careful analysis of the figures submitted by the petitioner as to earnings, dividends, taxes paid, sundry charges, and loss sustained throughout the period from March 1, 1913, through 1926, discloses that in 1913, $18,956 of the distribution made was out of March 1, 1913, surplus; that in 1915 $4,229.85 of the distribution was out of March 1, 1913, surplus; that in 1917, $4,197.87 of the distribution was out of March 1, 1913, surplus; that thereafter there were at all times sufficient earnings or profits accumulated subsequent to February 28, 1913, to cover any loss or dividend paid; and that the aggregate distributions made in

the year 1926 were out of earnings or profits accumulated after February 28, 1913. Interest received by the company on United States obligations can not be excluded in the calculation of earnings available for taxable dividends. Sec. 213 (a) and (b) (4), Revenue Acts of 1924 and 1926. See *Arthur Curtiss James*, 13 B. T. A. 764; affirmed on other grounds in *Commissioner* v. *James*, 49 Fed. (2d) 707; and *Hitner* v. *Lederer*, 63 Fed. (2d) 877.

*Decision will be entered for the respondent.*