605 F.2d 1258
 79-2 USTC P 9547
 CA 79-3190 ESTATE OF Percy URIS, Deceased, Irving Trust Co.,
Executor, and Joanne Uris, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Harold D. URIS and Ruth Uris, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
 Nos. 974, 975, Dockets 79-4025, 79-4026.
 United States Court of Appeals,
Second Circuit.
 Argued June 4, 1979.
Decided Aug. 16, 1979.
 
 Laurence Goldfein, Roberts & Holland, New York City (Sidney I. Roberts, New York City, of counsel), for appellants.
 James A. Riedy, Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen.; Gilbert E. Andrews and Ernest J. Brown, Attys., Washington, D. C., of counsel), for appellee.
 Before OAKES and MESKILL, Circuit Judges, and SIFTON, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 The question presented by this appeal is unusually complicated: whether a corporate distribution is out of "earnings and profits" and thus fully taxable to the distributees as dividends. The distributees were Percy Uris, now deceased, and Harold Uris; and the tax liability here involved is for each of them and their wives as co-signers of separate joint tax returns, collectively hereinafter referred to as "taxpayers." On March 26, 1969, Uris Lexington, Inc., which is a real estate corporation in New York City and a taxpayer on a calendar year basis, made the distribution of $2,569,240, or $1,284,620 to each distributee, of which $800,000 was in money and $484,620 was in securities. Under I.R.C. § 301(c),[1] taxpayers reported the distribution on their 1969 returns as part dividend, part reduction in basis of their stock in Uris Lexington, and part gain from the sale or exchange of property. The Commissioner, however, determined that under I.R.C. § 316(a)[2] the distribution was taxable in full as a dividend; accordingly he determined deficiencies in the years 1969 and 1970 for Percy and Joanne Uris[3] and in 1969 for Harold and Ruth Uris. The United States Tax Court, Irene F. Scott, Judge, upheld the Commissioner. 68 T.C. 448 (1977). Taxpayers filed timely appeals, now consolidated, under I.R.C. § 7482. We affirm.
 
 THE FACTS
 
 2
 The parties submitted the case to the Tax Court on a stipulation, so the facts before us are undisputed.
 
 
 3
 On November 24, 1954, Percy and Harold Uris together with certain other individuals formed Uris Lexington, Inc., to hold land and construct and operate an office building at 485 Lexington Avenue in New York, New York. On formation, the corporation issued 980 shares of no par value common stock for a total consideration of $750,000. Percy and Harold Uris each received 350 shares for $175,000, and the remaining investors (the minority shareholders) received a total of 280 shares for $400,000.
 
 
 4
 Construction of the building was completed in 1956, and from then through 1969 the building had almost a one hundred percent occupancy rate and as a result was financially successful. A financial chart set out in the margin sets forth the annual profits and losses of the corporation.[4]
 
 
 5
 During fiscal year 1960 Uris Lexington made to all its shareholders a pro rata distribution of $588,000. The tax consequences of this distribution are not in issue here.[5]
 
 
 6
 In 1962, however, the minority shareholders of Uris Lexington disagreed with Percy and Harold Uris as to the proper disposition of the profits of the corporation. According to the corporate minutes, the former were "opposed to the investment of corporate funds in any other ventures," while the latter wanted to "refinanc(e) the mortgage on the property and invest( ) the proceeds in other projects." The shareholders resolved the disagreement by having the corporation totally redeem all of the shares that the minority shareholders held. On April 3, 1962, Uris Lexington redeemed the minority's 280 shares of outstanding common stock for $10,200 per share, a total of $2,856,000. The board of directors further resolved to amend the certificate of incorporation to provide for a reduction of 280 shares in the number of shares of capital stock. This distribution qualified under I.R.C. §§ 302(a) and (b)(3) as a distribution in full payment in exchange for each shareholder's stock.[6] Thus the minority shareholders were entitled to treat the major portion of the $2,456,000 excess of the distribution over their original contribution to capital of $400,000 as long-term capital gain.[7] This major portion could not have been paid out of accumulated earnings and profits.[8] Rather, as a practical matter, it was paid from money borrowed against the value of the successful building. At the corporation's request, the mortgage lender reappraised the value of the building as of the time of the 1962 loan; because the appraisal was obviously well in excess of the original cost as well as the then tax basis of the building,[9] the corporation could obtain cash in exchange for an addition to the existing mortgage. No write-up of assets was made on the books of the corporation, although one of the principal points that taxpayers make on this appeal is that in effect the distribution was out of unrealized appreciation of the value of the building.
 
 
 7
 On March 26, 1969, Uris Lexington made a distribution in the amount of $2,569,240 with respect to the remaining capital common stock, which Percy and Harold Uris now owned in its entirety. Taxpayers reported the income from the distribution as a dividend in the amount of $182,020, § 301(c)(1); a reduction of basis in the amount of $175,000 (the initial investment) § 301(c)(2); and as gain from the sale or exchange of property in the amount of $927,600, § 301(c) (3). See note 1 Supra. The Commissioner, however, treated the distribution as taxable in full to taxpayers as a dividend,[10] resulting in deficiencies in the federal income tax of Percy and Joanne Uris in the amount of $629,333 for 1969 and $15,284 for 1970, See note 3 Supra, and a deficiency of $611,835 for Harold and Ruth Uris for 1969.
 
 
 8
 Taxpayers took the position before the Tax Court that the earnings and profits in years following 1962 had to absorb (or offset) the amount of the 1962 redemption of the minority shareholders' stock in excess of their contribution to capital before any accumulated earnings and profits became available for payment as a dividend to taxpayers as the remaining shareholders. Cf. Jarvis v. Commissioner, 43 B.T.A. 439, Aff'd, 123 F.2d 742 (4th Cir. 1941). Taxpayers relied on I.R.C. § 312(d),[11] which they said required the result that post-1962 earnings and profits should be applied to the "deficit" that the 1962 redemption created because the distribution was out of unrealized appreciation and not earnings and profits which were insufficient at the time. See note 8 Supra. The deficit could arise, they argued, because the limitation of § 312(a), note 11 Supra, of a reduction on distribution of the earnings and profits of a corporation "to the extent thereof" did not apply to redemption distributions. The Tax Court rejected this analysis and held that § 312(a) was applicable to a redemption distribution, stating that taxpayers' argument was merely another way of arguing that a distribution and redemption of stock could create a deficit in earnings and profits, a procedure that would permit a corporation always to avoid making dividend distributions.
 
 DISCUSSION
 
 9
 The wording of taxpayers' position on appeal and the particular material upon which they rely is somewhat different from the position that they took in the Tax Court, but substantively it is the same. Taxpayers no longer argue that § 312(a) does not apply to a redemptive distribution or that § 312(e) requires the result that they urge. Rather, they argue that "to the extent that the amount of the 1962 redemption exceeded the charges in paid-in capital and earnings and profits, such excess represents unrealized appreciation of the assets of the corporation, and from the viewpoint of the corporation's tax accounting, is properly treated as a 'deferral account' to be offset by earnings in future years." For the creation of an unrealized appreciation account, they rely upon Revenue Ruling 70-531, 1970-2 C.B. 76, in which the Commissioner announced his nonacquiescence in the Jarvis decision; for the use of the post-1962 earnings to offset the charge to unrealized appreciation, they rely upon what they characterize as "reasonable tax accounting principles and economic realities."
 
 
 10
 The Revenue Ruling purports to give advice as to what portion of the distribution and redemption described in it is chargeable to earnings and profits for the purpose of computing the amount of accumulated earnings and profits available for the payment of dividends. The Ruling is based on the situation of two stockholders, each owning fifty percent of the stock of a corporation, and a complete redemption (treated as a distribution in full payment in exchange) of one person's stock. The redemption was out of cash. Jarvis, supra, had held that only a proportionate part of the capital would be considered as standing behind each of the shares redeemed so that the balance of the distribution would be charged to earnings and profits even though in excess of the ratable share of earnings and profits attributable to the stock redeemed. The result was that the charge to capital was in an amount such that the ratio between the charge to capital and the capital prior to retirement would be the same as the ratio between the number of shares retired and the total number outstanding prior to retirement. Under the Revenue Ruling, however, the charge to earnings and profits is determined first; and the proper charge to the capital account on the redemption includes not only the allocable portion of the capital paid in for stock at its basis for federal income tax purposes but also the pro rata share of the other "attributes including unrealized appreciation surplus of the corporation." The charge to earnings and profits under the Ruling, then, is the pro rata portion of the total earnings and profits of the corporation thereof attributable to the shares redeemed.
 
 
 11
 On the strength of this Ruling and some statements by the commentators[12] taxpayers argue that under reasonable tax accounting principles and economic realities, as well as tax fairness, the unrealized appreciation reflected in the redemption paid to the terminated shareholders must be credited as it is realized against an unrealized appreciation account absent which the effect of the later distribution will be to tax the remaining shareholders (taxpayers here) on the amount of earnings and profits previously received by and taxed to the redeemed shareholders.[13] This argument assumes that the effect of the 1962 terminal redemption of the minority stockholders was, or should properly have been, to establish, or should at least now be viewed as having established, in some form an unrealized appreciation surplus account. It would lead to the conclusion that the 1962 redemption of the minority shareholders reduced the earnings and profits available for the 1969 distribution, making it therefore only partially taxable as a dividend.
 
 
 12
 With this rather complicated introduction to the problem, we turn to the basic underlying law as to corporate distributions. As a leading commentator has pointed out, in the abstract the problem of taxing corporate distributions is simple because every revenue act has expressly provided that gross income shall include dividends. But it is often an intricate and complex problem to determine as a practical matter what is an ordinary taxable dividend and what is another form of corporate distribution to stockholders. See 1 J. Mertens, Law of Federal Income Taxation § 901 (1974). Section 316 of the Internal Revenue Code, note 2 Supra, defines a dividend as any distribution of property by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913, or out of the earnings and profits of the current taxable year. Any distribution that is a dividend under § 316 is includable in gross income under I.R.C. § 301(c)(1), note 1 Supra. Any portion of a distribution that is not a dividend is applied first to reduce the shareholder's adjusted basis under § 301(c)(2) and any excess treated as a gain from the sale or exchange of property under § 301(c)(3). Id. Since 1936, dividends have been defined to include distributions out of current earnings regardless of any preexisting deficit. Section 115(a) of the 1936 Act, now incorporated into § 316(a)(2). Thus the primary question with respect to a corporate distribution is whether it is a distribution out of either accumulated earnings and profits or earnings and profits of the taxable year, in which case it is a dividend under § 316 and includable in gross income under § 301(c)(1). Despite the importance of this question, the statute itself does not define earnings and profits. We are left in the individual case to determine from the usual tax melange of statutes, regulations, rulings, and case law what are earnings and profits. We do so, not taxonomically, but seeking economic substance or reality.
 
 
 13
 Certain guideposts aid us in our quest for the elusive grail of economic tax reality. We note, of course, that "earnings and profits," a statutory concept, bears no exact relation either to taxable income or to earnings as determined by "corporate accounting concepts" in the given context. Commissioner v. Wheeler, 324 U.S. 542, 546, 65 S.Ct. 799, 89 L.Ed. 1166 (1945). Thus the amount of earnings or profits appearing on the corporation's books is not determinative and perhaps not even prima facie evidence of earnings or profits for income tax purposes. Wilson v. Commissioner, 31 B.T.A. 1022 (1935); Freshman v. Commissioner, 33 B.T.A. 394 (1935), Appeal dismissed (2d Cir. Nov. 17, 1936).[14] Although some of the early cases make rather broad statements about reliance on "ordinary accounting understanding," See Commissioner v. James, 49 F.2d 707, 708 (2d Cir. 1931), it is clear that earnings and profits is an economic concept that the tax law utilizes "to approximate a corporation's power to make distributions which are more than just a return of investment." 1 J. Mertens, Supra, § 9.28, at 92; See Henry C. Beck Co. v. Commissioner, 52 T.C. 1 (1969), Aff'd, 433 F.2d 309 (5th Cir. 1970). But by this very definition we are "approximating," and this usually involves drawing lines which may in and of themselves be arbitrary.
 
 
 14
 In determining the character of the 1969 distribution we are aided by the conclusive statutory presumption set forth in § 316 that except as otherwise specifically provided all distributions are presumed to be made out of earnings and profits to the extent thereof and, more specifically, from those most recently accumulated. See Grubbs v. Commissioner, 39 T.C. 42, 52 (1962). Under the regulations, § 1.316-2(a),[15] a year-by-year computation is necessary in part because adjustments for prior years may alter those prior year balances and determinations and have an effect in subsequent years due to the absence of a statute of limitations with respect to earnings and profits. 1 J. Mertens, Supra, at § 9.27, at 89; and See Luckman v. Commissioner, 56 T.C. 1216, 1223-25 (1971). Thus, unless the 1962 redemption in some way affected the earnings and profits of Uris Lexington, the 1969 distribution was a payment of dividends because the corporation had accumulated sufficient earnings between 1962 and 1969 to cover the amount that it paid to taxpayers in 1969. See note 4 Supra.
 
 
 15
 Again we turn to the basic guideposts to determine the effect of the 1962 redemption. One is that an impairment of fixed or statutory capital occasioned by operating losses must be restored out of subsequent earnings before there can be accumulated earnings or profits available for dividends. 1 J. Mertens, Supra, § 9.26, at 85; Willcuts v. Milton Dairy Co., 275 U.S. 215, 48 S.Ct. 71, 72 L.Ed. 247 (1927); United States v. El Pomar Investment Co., 330 F.2d 872 (10th Cir. 1964); Van Norman Co. v. Welch, 141 F.2d 99, 101 (1st Cir. 1944); Commissioner v. W. S. Farish & Co., 104 F.2d 833 (5th Cir.), Cert. denied, 308 U.S. 559, 60 S.Ct. 91, 84 L.Ed. 469 (1939). Another guidepost is that accumulated earnings and profits available for dividends are not to be diminished to restore an impairment or reduction of capital caused by distributions as distinguished from operating losses. See 1 J. Mertens, Supra, § 9.26, at 86; Meyer v. Commissioner, 7 T.C. 1381, 1383 (1946); Wilson, supra; Bolster v. Commissioner, 23 B.T.A. 347 (1931); Henninger v. Commissioner, 21 B.T.A. 1235 (1931); Cf. Van Norman Co. v. Welch, supra, 141 F.2d at 102 (capital deficit resulting from distribution; deficit need not be restored before subsequent earnings can be made available for dividends).
 
 
 16
 The rule that only operating losses and not voluntary distributions will decrease earnings and profits is sound because a contrary rule would permit a corporation to make distributions not taxable as dividends by the simple expedient of making distributions out of capital, then restoring the deficit out of earnings, and then repeating the process. See Henninger,supra, 21 B.T.A. at 1238. See also Rudick, "Dividends" and "Earnings or Profits" Under the Income Tax Law: Corporate Non-Liquidating Distributions,89 U.Pa.L.Rev. 865, 873-74 (1941). Cf. Foster v. United States, 303 U.S. 118, 120-21, 58 S.Ct. 424, 82 L.Ed. 700 (1938) (provisions for payment of dividends from most recently accumulated, and not pre-1913, earnings and profits to prevent tax avoidance). Under taxpayers' argument, even current earnings and profits of Uris Lexington for 1969 would have to be used first to restore the "deficit" that they had created by the 1962 distribution, a result that would fly in the face of § 316(a)(2) and United States v. El Pomar Investment Co., supra. See B. Bittker & J. Eustis, Federal Income Taxation of Corporations and Shareholders P 7.02 (3d ed. 1971).
 
 
 17
 Taxpayers would limit to pro rata distributions and not to distributions in redemption the principle that a voluntary distribution cannot create a deficit in earnings and profits. In the case of redemptions, they would recognize instead the creation of an unrealized appreciation account which would be offset by future earnings and profits. But there are two reasons why taxpayers' arguments do not require a resolution in their favor. First, such a distinction between distributions and redemptions would still enable a corporation to avoid ever having its earnings treated as dividends merely by redeeming part of the stock owned by its shareholders rather than making pro rata distributions. Even if limited to complete redemptions, the device would be effective at least once for each shareholder; and for the corporation, so long as there were shareholders left to redeem.
 
 
 18
 But there is a more fundamental reason why taxpayers' approach will not produce a proper result under the tax laws. Even if we were to hold that the 1962 distribution, although not in itself creating a deficit in earnings and profits, did create an unrealized appreciation account, we could not hold, as taxpayers would then have us do, that the account so created had the same effect on earnings and profits as a direct deficit, that is, that subsequent earnings and profits must be viewed as offsetting the account. Again, the basic principles of earnings and profits preclude this result. The statute, I.R.C. § 312(f)(1),[16] specifically provides that Realized gains or losses from the sale or other disposition of property after February 28, 1913, increase or decrease earnings and profits only to the extent that they are Recognized in computing taxable income under the law applicable to the year in which the sale or other disposition of the property is made. See Commissioner v. Gross, 236 F.2d 612, 615 (2d Cir. 1956); Wilson v. Commissioner, 46 T.C. 334, 351-52 (1966); See also Commissioner v. Wheeler, supra. By contrast, Unrealized increases or decreases in the value of property retained by a corporation "have no effect on earnings or profits, whether or not they are written up or written down on the books of the corporation." 1 J. Mertens, Supra, § 9.43, at 116-17; See Commissioner v. Gross, supra; Page v. Haverty, 129 F.2d 512 (5th Cir. 1942).[17] Thus, even indirectly, the 1962 distribution does not affect the 1962-1969 earnings and profits so as to reduce the amount available for distribution as a dividend.
 
 
 19
 Taxpayers make much of the recognition in Jarvis, supra, and Revenue Ruling 70-531 of an unrealized appreciation account, although taxpayers relied on the former in the Tax Court and the latter, diametrically opposed, on appeal. But neither Jarvis nor the Revenue Ruling addresses the issue in this case. Both dealt with ascertaining the amount of earnings and profits available for dividends immediately after redemption of stock, and they reached opposite conclusions; but neither suggested that earnings and profits subsequently realized were not fully available for dividend distributions. Neither Jarvis nor the Revenue Ruling disputes the firmly established rules that voluntarily created deficits, as contrasted with deficits resulting from operating losses, are not to be restored from subsequent earnings and profits and that unrealized appreciation also does not affect earnings or profits.
 
 
 20
 To be sure, taxpayers claim that there is unjustified "double counting" in a case such as this, that is to say, a matter of tax inequity in that the distribution to the redeemed shareholders of unrealized appreciation does not reduce the potential dividend liability of the continuing shareholders with respect to future distributions by the corporation. See commentators cited in note 12 Supra. We note, of course, that there is no "double counting" or double tax liability of taxpayers themselves; their complaint, rather, is that both they and the redeemed shareholders must pay tax on the unrealized appreciation. The flaw in taxpayers' argument is that with respect to appreciated property, earnings and profits do not arise, as this court pointed out in Gross, supra, until and unless there is a sale or disposition of that property. Thus the redeemed shareholders have paid taxes on the amount received from the corporation, but they did not pay taxes on the corporation's earnings and profits. In the terminal redemption situation, under § 302(a) the tax results to the individual redeeming stockholders have no relationship whatsoever to past or future earnings and profits; instead the tax is measured on the difference between the basis of the stock redeemed and the amount received on redemption.
 
 
 21
 Moreover, even aside from the technical difficulty of recognizing that the terminating stockholders paid taxes on earnings and profits that did not yet arise, the economic reality is that the amount paid per share of stock redeemed reflects or may reflect various factors that may or may not directly bear on the prospective increased future profits and does not necessarily result from "unrealized appreciation." It is more likely that the amount represented not only a realization on appreciated assets but also compensation to the terminating shareholders for their loss in withdrawing their investment in the future worth of the corporation and the value to the remaining shareholders of being able to determine without opposition the future activities of the corporation.
 
 
 22
 Here, the interested parties in the corporation were unable to agree in 1962 on the future course of the corporation's development. Taxpayers wanted to put the rental income to work by going into other projects while the stockholders whose stock was redeemed may have either wished to realize immediately the appreciated value of the corporation's assets or may have wished to remain as pro rata participants in the operations of the corporation only so long as they were confined to the operation of the successful building on Lexington Avenue. In any case, the parties decided to go their separate ways; and the corporation redeemed at a substantial increment in value the shares of the minority group. The method of doing this was not by a sale or disposition of the building itself but by borrowing against the value reflected in the bank's reappraisal. What took place was an outcome negotiated between the parties, taking into account both sides' views. In this light, it is not appropriate to treat the distribution as a reduction of the corporation's future earnings and profits. The distribution in no way involved an operating deficit, a corporate expense, or cost of doing business. Rather it was more in the nature of a capital investment by the corporation itself somewhat in the nature of a corporation's "going private," the current phrase used for the purchase by a corporation of its own stock.
 
 
 23
 Finally, Commissioner v. Gross, supra, itself suggests the possibility of "double counting," to the extent that taxpayers use the term to mean payment of capital gains taxes by the redeemed shareholders and their own subsequent payment of ordinary income taxes on some portion of the unrealized appreciation. Gross held that the distribution out of unrealized appreciation was taxable only as capital gain because if taxed as ordinary income from dividends the same earnings "might twice provide a source of taxable dividends." 236 F.2d at 617. The second source of taxable dividends would arise when through sale of the property or receipt of rental payments the corporation realized the unrealized appreciation in value and the realization increased the earnings and profits. Only to the extent of applying the capital gains tax rate on the first distribution did this court refuse to allow "double counting" of the value of the unrealized appreciation. We did not preclude, and in fact we envisioned, the imposition of capital gains tax on the first distribution and ordinary income tax on a later dividend distribution.
 
 
 24
 In reality, then, Uris Lexington spent money to redeem a portion of its own stock, and this cannot be treated as reducing subsequent earnings and profits; nor can the capital gains tax paid by the redeeming shareholders preclude taxation of the distribution to taxpayers as ordinary income. Accordingly the later distributions to taxpayers are properly viewed, in the main, as dividend income. Taxpayers will be able to avoid "double counting" against themselves of the unrealized appreciation if and when they liquidate the corporation in their hands and qualify for treatment of the then "unrealized appreciation" on a capital gain basis under the tax statutes. In the interim, they must treat as dividends taxable as ordinary income any distributions out of the earnings and profits from the operations of the building.
 
 
 25
 Judgment affirmed.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 I.R.C. § 301 provides in pertinent part:
 § 301. DISTRIBUTIONS OF PROPERTY.
 (a) In general. Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).
 (c) Amount taxable. In the case of a distribution to which subsection (a) applies
 (1) Amount constituting dividend. That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.
 (2) Amount applied against basis. That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.
 (3) Amount in excess of basis.
 (A) In general. Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.
 (B) Distributions out of increase in value accrued before March 1, 1913. That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax.
 The distributees each reported the distribution as follows:
 Dividend (Sec. 301(c)(1)) .............. $ 182,020
 Reduction of basis (Sec. 301(c)(2)) ....... 175,000
 Gain from sale for exchange (Sec. 301
 (c)(3)) ................................. 927,600
 Total .................................. $1,284,620
 
 
 [2]
 I.R.C. § 316(a) provides in pertinent part:
 § 316. DIVIDEND DEFINED.
 (a) General Rule. For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders
 (1) out of its earnings and profits accumulated after February 28, 1913, or
 (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
 Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
 
 
 [3]
 Two taxable years were involved for Percy and Joanne Uris because the redetermination of income in the first resulted in an increased allowance for a charitable contribution deduction in that year and a reduction in the carryover to the second
 
 
 [4]
 
 Federal
 Tax Income
 Exempt Taxes Paid
 Profit Income (Subtracted
 Year (Loss) (Includable from
 Ending from in "earnings "earnings
October 31 Operations and profits") and profits")
---------- ---------- ------------- -------------
 1955 $(232,949) -- --
 1956 (498,319) -- --
 1957 (512,962) -- --
 1958 166,459 -- --
 1959 299,617 -- --
 1960 517,011 $ 324 --
 1961 738,621 -- $242,789
 1962 650,994 -- 333,017
 1963 691,277 -- 353,964
 1964 720,235 -- 355,768
 1965 748,166 -- 355,037
 1966 767,190 3,731 361,751
 1967 839,733 22,408 396,572
 1968 833,315 79,160 426,282
 1969 755,644 66,508 391,625
 
 
 [5]
 Presumably under I.R.C. § 316(a)(2), note 2 Supra, because there were $517,011 profits and $324 tax exempt income for 1960, See note 4 Supra, resulting in current profits of $517,335, that amount of the $588,000 distribution, or 88%, was taxable to the shareholders as dividends. Because there were no accumulated profits, but rather there was an accumulated deficit of $778,153 (losses in 1955-57 offset by profits in 1958 and 1959, note 4 Supra ), the remaining 12% Of the distribution would go to reduce each stockholder's basis under I.R.C. § 301(c)(2), note 1 Supra, and thereafter be taxable as gain from a sale or exchange under I.R.C. § 301(c)(3), Id. In any event that voluntary distribution would not increase the deficit in accumulated earnings and profits. Meyer v. Commissioner, 7 T.C. 1381, 1383 (1946); Henninger v. Commissioner, 21 B.T.A. 1235 (1931)
 
 
 [6]
 I.R.C. § 302 provides in pertinent part:
 § 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.
 (a) General rule. If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
 (b) Redemptions treated as exchanges.
 (3) Termination of shareholder's interest. Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.
 
 
 [7]
 If the 1960 distribution was treated as having already reduced the $400,000 capital contribution, See note 5 Supra, then the excess of the distribution would be more than $2,456,000; but the excess of whatever amount was capital gain
 
 
 [8]
 As stated, note 5 Supra, there was an accumulated deficit of $778,153 through 1959, which the distribution in 1960 did not affect. Earnings and profits for 1961 of $495,832 ($738,621 earned less $242,789 federal taxes, See note 4 Supra ), reduced this deficit to $282,322. There were $317,977 of earnings and profits for 1962 ($650,994-$333,017) absorbed in the redemption distribution. We agree with the Commissioner that there remained a deficit from operations of $282,322 carried forward from 1959 and still requiring restoration. The remainder of the $2,456,000 over the excess of the dividend paid out of current earnings and in excess of the basis would have been capital gain
 
 
 [9]
 In fact, on an "economic approach" the reappraisal showed the market value to be $24,325,000 of which $5,400,000 was allocated to land; on an approach based upon comparable sales of land and replacement cost of the building, $26,150,000 was the value on reappraisal. The tax basis in the building was $13,093,142 less $4,091,913 depreciation and of the land $4,189,546
 
 
 [10]
 After the 1962 distribution, a deficit of $282,322 remained. Earnings and profits for 1963-68 aggregated $2,455,841 per table in note 4 restoring the deficit and producing accumulated earnings and profits of $2,173,519 at the end of 1968, assuming that the redemption distribution is not treated as taxpayers would have it. This, together with current earnings and profits in 1969 of $430,547 ($755,661 k $66,508 - $391,625) made a total of $2,604,066, a sum in excess of the amount actually distributed in 1969 and here in dispute
 
 
 [11]
 I.R.C. § 312 provides in pertinent part:
 § 312. EFFECT ON EARNINGS AND PROFITS.
 (a) General Rule. Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of
 (1) the amount of money,
 (2) the principal amount of the obligation of such corporation, and
 (3) the adjusted basis of the other property, so distributed.
 (e) Special Rule for Partial Liquidations and Certain Redemptions. In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.
 
 
 [12]
 See Edelstein, Revenue Ruling 70-531 : Section 312(e) Revisited, 26 Tax L.Rev. 855, 861 (1971); Jacoby, Earnings and Profits: A Not So Theoretical Concept Some Winds of Change, 29 N.Y.U.Inst. on Fed.Tax. 649, 658 (1971); McDaniel, Earnings and Profits: More Than a Cold Accounting Concept: Additions to and Subtractions From, 32 N.Y.U.Inst. on Fed.Tax. 445, 483 n.63 (1974)
 The commentators by no means provide unequivocal support for taxpayers' position. None of them treats of the specific situation in this case. Edelstein, for example, also recognizes that the Revenue Ruling "obviously ignores" the need to provide for the subsequent disposition of the unrealized appreciation surplus account when the unrealized appreciation is realized. And although he suggests that the "previously distributed appreciation should not be added to the earnings and profits available for distribution as dividends to the remaining shareholders" because "(s)uch a result would, in effect, tax the same appreciation twice," 26 Tax.L.Rev. at 861, he does recognize that this result is exactly that which would obtain under Commissioner v. Gross, 236 F.2d 612 (2d Cir. 1956). Gross, Edelstein points out, "makes the important and obvious point that the distributed unrealized appreciation, when subsequently realized by the corporation, will increase its earnings and profits, and thus such earnings will in effect be taxed to the shareholders twice." 26 Tax.L.Rev. at 857 n.9. As we note Infra in text, the most equitable arrangement that Gross would sanction was a prohibition of taxing Both distributions as a dividend; the case did not preclude as inequitable taxing Either distribution as a dividend.
 Edelstein also recognizes, as we discuss Infra in text, that the so-called unrealized appreciation surplus does not always represent unrealized appreciation distributed in redemption but may in fact be only "a balancing entry necessary to achieve an artificial balance in the tax basis balance sheet, and nothing more." See id. at 860-61. In the example that Edelstein uses, the account reflects only the difference between the tax basis of the assets distributed on the redemption and the redeemed shares' pro rata portion of the total net tax basis of the corporation's assets.
 Neither does McDaniel support the position that taxing the distribution to taxpayers as ordinary income is inequitable merely because the redeemed shareholders paid tax on the distribution in redemption. McDaniel states only that "(p)resumably under Rev.Rul. 70-531, a subsequent realization will set off the earlier charge to 'unrealized appreciation' or 'revaluation surplus' so that earnings and profits will not be increased twice by the same appreciation." 32 N.Y.U.Inst. on Fed.Tax. at 483 n.63. Here, according to the calculations set forth at note 8 Supra, the redemption distribution was not paid out of earnings and profits, nor were the shareholders taxed as if it were. (They paid capital gains tax and not ordinary income tax.) Thus to recognize the payment of this distribution out of earnings and profits does not twice increase earnings and profits by the same appreciation; rather this distribution alone comes from earnings and profits. Cf. Commissioner v. Gross, 236 F.2d 612 (2d Cir. 1956).
 
 
 [13]
 Taxpayers would have us remand to the Tax Court to determine the proper method of crediting the post-1962 earnings and profits to the unrealized appreciation account, suggesting three possibilities: (1) set off all subsequently generated earnings and profits until the "unrealized appreciation" surplus account is eliminated; (2) amortize the charge to unrealized appreciation surplus over a period of 10 years; or (3) charge the excess of the redemption price over the redeemed shares' pro rata portion of capital account and earnings and profits to a deferral account, to be offset and absorbed by the portion of future earnings and profits that would have been attributable to the redeemed shares if the redemption had not occurred
 
 
 [14]
 Similarly, the omission to make the entry (here of unrealized appreciation) on the books cannot be itself determinative of the result; and, as our opinion indicates, we do not regard it as determinative or even persuasive evidence
 
 
 [15]
 26 C.F.R. § 1.316-2(a) provides:
 Sources of distribution in general.
 (a) For the purpose of income taxation every distribution made by a corporation is made out of earnings and profits to the extent thereof and from the most recently accumulated earnings and profits. In determining the source of a distribution, consideration should be given first, to the earnings and profits of the taxable year; second, to the earnings and profits accumulated since February 28, 1913, only in the case where, and to the extent that, the distributions made during the taxable year are not regarded as out of the earnings and profits of that year; third, to the earnings and profits accumulated before March 1, 1913, only after all the earnings and profits of the taxable year and all the earnings and profits accumulated since February 28, 1913, have been distributed; and, fourth, to sources other than earnings and profits only after the earnings and profits have been distributed.
 
 
 [16]
 I.R.C. § 312(f)(1) provides in pertinent part:
 (f) Effect on earnings and profits of gain or loss and of receipt of tax-free distributions.
 (1) Effect on earnings and profits of gain or loss. The gain or loss realized from the sale or other disposition (after February 28, 1913) of property by a corporation
 (A) for the purpose of the computation of the earnings and profits of the corporation, shall (except as provided in subparagraph (B)) be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain, except that no regard shall be had to the value of the property as of March 1, 1913; but
 (B) for purposes of the computation of the earnings and profits of the corporation for any period beginning after February 28, 1913, shall be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain.
 Gain or loss so realized shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing taxable income under the law applicable to the year in which such sale or disposition was made.
 
 
 [17]
 The limited exception is a writedown reflecting worthlessness of an asset. 1 J. Mertens, Law of Federal Income Taxation § 9.43, at 117 (1974)